## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**STEVEN ELLISON,**

Plaintiff,

Case No. 20-cv-12428

**v.**

**GROSSE ILE TOWNSHIP SCHOOLS,**

Defendant**.**

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff, Steven Ellison, brings this Complaint for damages and demand for jury trial against Defendant, Grosse Ile Township Schools ("Grosse Ile"), and states as follows:

### PARTIES

1. Plaintiff is a resident of the State of Michigan and resides in Wayne County, Michigan.

2. Defendant, Grosse Ile, is a school district located in Wayne County, Michigan.

3. The events described in this lawsuit primarily occurred in Wayne County, Michigan.

4. At all times material hereto, Plaintiff was an "employee" of Defendant

as defined by Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 701 *et seq.*, and Michigan's Persons with Disability Civil Rights Act ("PDCRA"), MCL §37.1101 *et seq.*

5.      At all times material hereto, Defendant was an "employer" a defined by Section 504 and PDCRA.

6.      Defendant is a "program or activity receiving Federal financial assistance" as defined by Section 504. *See* 29 U.S.C. § 794.

7.      Defendant receives Federal financial assistance and, by doing so, Defendant has waived immunity under Section 504.

8.      Defendant has a workforce that includes more than 500 employees.

## JURISDICTION

9.      The jurisdiction of this court is invoked pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*

10.      As such, the Court has original jurisdiction over this complaint pursuant to 28 U.S.C. §§ 1331 and 1337.

11.      The Court has supplemental jurisdiction over Plaintiff's PDCRA claims, MCL §37.1101 *et seq.*, because these claims are so related to Plaintiff's Section 504 claims that they form part of the same case or controversy.

12.      This Court has jurisdiction to grant injunctive relief and declaratory relief, as well as damages pursuant to the statutes cited above as well as Ex Parte

Young, 209 U.S. 123 (1908) pursuant to Plaintiff's request for prospective injunctive relief.

## VENUE

13.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred within the Southern Division of the Eastern District of Michigan.

14.     Defendant conducts substantial and not isolated business within the Southern Division of the Eastern District of Michigan.

15.     Defendant has agents and employees in the Southern Division of the Eastern District of Michigan.

16.     Defendant has a business located in the Southern Division of the Eastern District of Michigan.

## CONDITIONS PRECEDENT

17.     Plaintiff has exhausted his administrative remedies by filing charges of discrimination with the Equal Employment Opportunity Commission and Michigan Department of Civil Rights on October 16, 2018 and March 16, 2019.

18.     On August 19, 2020, the Department of Justice issued Plaintiff two Right to Sue letters with regard to his two charges of discrimination.  Copies of these Right to Sue letters are attached as **Exhibit A**.

19.     Plaintiff files this action within the applicable period of limitations.

3

20.     All conditions precedent to this action have been satisfied and/or waived.

## STATEMENT OF FACTS

21.     In August 1997, Ellison began working for Grosse Ile.

22.     Ellison has a dual diagnosis of bipolar and general anxiety disorder.

23.     Both bipolar and general anxiety disorder are disabilities as defined by the Section 504 and the PDCRA.

24.     At all material times, Ellison was a qualified individual with a disability within the meaning of Section 504 and the PDCRA because Plaintiff had a disability and/or was perceived by Defendant as having a disability that substantially limited his ability to perform one or more major life activities.

25.     Specifically, this disability substantially limits Ellison's ability to perform manual tasks, talk, communicate, work, and control his heart rate, amongst other things.

26.     Ellison's disability was known to Grosse Ile.

27.     In April 2017, the only other special education teacher in the school mentioned Ellison's bipolarity and anxiety to the principal.

28.     The principal's response was, "Why the fuck didn't someone tell me about this?"

29.     When made aware of the principal's response to Ellison's disability,

Ellison's anxiety went through the roof.

30.　　Ellison was negatively cited on his end of year evaluation for attendance, despite having better attendance than a similarly situated co-worker, who had no citation for attendance on their end of year evaluation.

31.　　On June 27, 2017, Ellison requested, through the school district's 504 coordinator, a meeting to draft a Section 504 plan (written request for accommodation), to accommodate his anxiety and bipolar disorders.

32.　　The 504 coordinator was immediately removed from this process after the initial meeting, and the superintendent handled the process.

33.　　This uncertainty escalated Ellison's anxiety.

34.　　On August 29, 2017, after several meetings and exchanges of information, Ellison's Section 504 plan was signed, along with intermittent FMLA paperwork.

35.　　On October 13, 2017, Ellison received his first write up in 20 years with the district for not having an attendance list in a bag on September 15, 2017.

36.　　Ellison was absent on September 15, 2017.

37.　　The substitute teacher had his binder with his attendance list.

38.　　Nonetheless, Grosse Ile wrote Ellison up because the attendance list was not inside of a bag.

39.　　Ellison took the remainder of October 13, 2017 off under his Section

504 plan.

40.      When the principal left the write-up meeting on October 13, 2017, he went into the lunchroom.

41.      When staff asked where Ellison was, the principal made a trumpet sound with his mouth and exclaimed, "504!"

42.      This elevated Ellison's anxiety, as he realized Grosse Ile would harass him for exercising his reasonable accommodation.

43.      On October 17, 2017, the principal and assistant principal confronted Ellison in an aggressive manner—most notably about his reasonable accommodation.

44.      Notably, they kept bringing up Ellison's 504 plan when commenting about days Ellison might miss in the future.

45.      This confrontation exacerbated Ellison's anxiety and depression.

46.      November 10, 2017, was the anniversary of Ellison's mother passing two years earlier.

47.      Ellison wanted to take the day off to accommodate his anxiety and depression, but the harassment and intimidation he faced on October 17 made him fearful.

48.      Anxiety filled and severely depressed, Ellison went into work and was subjected to a surprise performance evaluation that day.

49.     On January 26, 2018, Ellison finally had a performance evaluation meeting: 77 days after his evaluation, and 47 days after the deadline for this type of meeting under state guidelines.

50.     Ellison's anxiety over this meeting was drawn out for nearly seven extra weeks.

51.     After Ellison received a bad evaluation, he suspected Grosse Ile was setting him up for termination.

52.     This caused his anxiety to spike.

53.     In March 2018, Ellison was told he could not attend a Transitions conference, a large special education conference intimately related to his job.

54.     Every year Ellison would receive a grant covering nearly all the costs.

55.     Ellison had attended the conference for several years before with no issue.

56.     Grosse Ile preventing Ellison from attending the Transitions conference elevated his depression and anxiety.

57.     Around this time, Ellison began taking anxiety medication before work because he was having nearly daily anxiety attacks.

58.     On May 31, 2018, Ellison was placed on a heart monitor for two weeks.

59.     Ellison's primary care doctor attributed it to anxiety related to his working conditions.

60.     Ellison had no further symptoms after work ended because he was no longer in exposed to a hostile work environment on a daily basis.

61.     Every time Ellison experienced heart flutters, palpitations, and drops in heart rate he wondered how much longer he could continue to work in an environment that was clearly become hostile due to his disability and requests for accommodation.

62.     Ellison was scared to death because family members had heart issues and passed away from them.

63.     In June 2018, Grosse Ile turned Ellison down for Restorative Practice training, despite Ellison being the first to apply.

64.     Ellison applied again in the fall and was denied again by Grosse Ile.

65.     This increased Ellison's depression and anxiety as he was expected to then run these meetings having had no experience or training.

66.     These denials increased Ellison's anxiety and depression, as it was obvious to him that Grosse Ile was being treated differently due to his disability and request for accommodation.

67.     In September 2018, Grosse Ile denied Ellison an opportunity to co-lead the SAT prep that he has helped lead for years.

68.     From 2012-2018, Ellison headed the SAT prep program for the school and the ACT prep program before that.

69.     When the school year started, Grosse Ile demoted Ellison from his position as head of the SAT prep program and relegated him to a supporting role.

70.     Ellison lost a stipend of over $1000 as a result of this demotion.

71.     Again, this demotion increased Ellison's anxiety and depression, as it was obvious to him that Grosse Ile was treating differently due to his disability and request for accommodation.

72.     In September 2018 Grosse Ile, on multiple occasions, treated Ellison less favorably than other similarly situated employees without a disability.

73.     For example, when the other special education teacher needed a substitute for IEPTs, she would go and request the substitute.

74.     Ellison, on the other hand, would have to check to see if they Grosse Ile was not short substitutes, a major issue in schools, confirm a date, get administrative approval, call the parents to try to arrange a time, then go back to make sure this was available.

75.     If any of these above steps did not align with the dates, Ellison had to go back to the first step.

76.     Grosse Ile's differential treatment, due to Ellison's disability and request for accommodation, further exacerbated his anxiety, as obtaining necessary

days off are a function of the position.

77.     As another example of differential treatment, Grosse Ile permitted other teachers without a disability and who had not made a request for an accommodation to talk in the halls well beyond the bell, even when there was a full class of students waiting for instruction.

78.     These events took place with the administrators present and participating.

79.     On one occasion, a teacher who was permitted to leave class to have cake in the office, leaving their class unattended for a length of time, with no repercussions.

80.     Ellison, on the other hand, was written up for using his accommodation under Section 504.

81.     Again, Grosse Ile's differential treatment, due to Ellison's disability and request for accommodation, further exacerbated his anxiety.

82.     As a third example, during the month of September 2018, the other special education teacher missed 26.4% of her assigned classes, with no repercussions.

83.     Ellison, on the other hand, was disciplined for using his accommodation to miss a smaller percentage of his assigned classes.

84.     Ellison, at no time, left students unattended while using his

accommodations.

85.     Again, Grosse Ile's differential treatment, due to Ellison's disability and request for accommodation, further exacerbated his anxiety.

86.     During September 2018, Ellison had to increase his anxiety medication so that he did not have anxiety attacks in front of the students.

87.     Ellison spent most of September 2018 in bed after work and on weekends because he had trouble sleeping at night, and was exhausted from the anxiety and depression experienced daily.

88.     On September 21, 2018, Ellison was disciplined for exercising his reasonable accommodation.

89.     During this meeting, with Ellison under extreme anxiety, administration attempted to unilaterally change the 504 plan that had been agreed to the previous year with the superintendent.

90.     The notice for this meeting regarding the discipline was issued on September 14th—the 364th day after Ellison's previous write-up for an incident that occurred on September 15, 2017.

91.     Under the agreement from the previous write-up, it was to be removed from Ellison's records after one year if he did not receive any other write-ups during that time.

92.     On September 27, 2018, administration served Ellison with verbal

written reprimand, and unilaterally changing conditions and terms of his accommodation under Section 504 in the write-up.

93.     During September 2018, Ellison had to take medication before and after work to the point where Ellison could not increase his medications any more.

94.     On or about October 1, 2018, when discussing a write-up with Ellison, Grosse Ile's principal implied that he can make up evidence of wrongdoing.

95.     During negotiations between the Grosse Ile Education Association (union) and Grosse Ile Schools the subject of discipline came up.

96.     In a side conversation between Ellison and the principal, the principal made the following remark regarding the evidence for discipline: "The evidence is what I say it is."

97.     When Ellison asked how you fight that evidence, he stated, "Prove me wrong."

98.     As Ellison had already been written up arbitrarily and capriciously, this legitimized his fear that Grosse Ile would continue to write him up until they could justify terminating him.

99.     This sent Ellison's anxiety spiraling out of control once more.

100.    On October 17, 2018, Ellison was constructively discharged.

101.    Ellison's psychologist gave her medical opinion that "Mr. Ellison

should seek alternative employment" because he continued to experience "increased blood pressure, severe panic symptoms, heighted anxiety symptoms, and even the triggering of manic/depressive symptoms" because of the hostile work environment Grosse Ile created.

102.    Ellison's psychologist noted that the "therapeutic techniques did not appear to be containing the experienced symptoms…[r]ather, it appeared that the work environment itself was creating an unhealthy foundation for Mr. Ellison's mental well-being…."

103.    Ellison's psychologist noted that two months after Ellison left his position at Grosse Ile, "[t]he symptoms he had previously experienced in relation to work appear to be reduced exponentially." "Ultimately, the transition and reduction of symptoms from his prior work place to current position provide evidence suggesting that Mr. Ellison's previous employer provided a negative and unhealthy environment, which did not support him mentally and emotionally."

104.    In short, any reasonable person in Ellison's shoes would have been forced to resign.

105.    The cumulative effect of Grosse Ile's actions over the year and a half after they learned of Ellison's disability led to his constructive discharge.

**COUNT I**
**DISCRIMINATION IN VIOLATION OF SECTION 504**

106.    Ellison realleges and reincorporates paragraphs 1-105 as if fully set

forth herein.

107.    Ellison is an individual with a disability under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*

108.    At all relevant times, Ellison was qualified for the positions he held with Defendant.

109.    At all relevant times, Ellison could perform the essential functions for the positions he held with Defendant, either with or without a reasonable accommodation.

110.    During the time Ellison was employed by Defendant, he was subjected to disparate treatment and discrimination on the basis of his disability and/or perceived disability, as set forth herein.

111.    Defendant violated Section 504 by, *inter alia*, the following acts:

    a.    Constructively discharging Ellison because of his disability and/or perceived disability;

    b.    Denying employment opportunities to Ellison because of his disability and/or perceived disability; and/or

    c.    Subjecting Ellison to disparate treatment on the basis of his disability and/or perceived disability.

112.    Defendant's discriminatory actions were willful, deliberate, and intentional.

113.    The injuries to Ellison that arose as a consequence of Defendant's conduct were foreseeable and intentionally caused by Defendant.

114.    As a direct and proximate result of the Defendant's violation of Section 504, Ellison suffered economic damages including but not limited to, loss of wages, loss of benefits, back pay, front pay, and other expenses.

115.    As a direct and proximate result of Ellison's violation of Section 504, Ellison has suffered emotional, marital, and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

116.    As a direct, natural, proximate and foreseeable result of the actions of Defendant, Ellison has suffered injuries for which he is entitled to compensation, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

117.    The conduct of Defendant was so willful and wanton, and performed with malice or reckless indifference to the statutory rights of Ellison, as to entitle him to an award of punitive damages against Defendant, to deter them, and others, from such conduct in the future.

118.    Ellison is entitled to recover reasonable attorney's fees and litigation expenses pursuant to Section 504.

119.    Ellison, having been discriminated against by Defendant, has

suffered irreparable harm for which there is no plain, adequate or complete remedy at law.

## COUNT II
## DISCRIMINATION IN VIOLATION OF THE PDCRA

120.    Ellison realleges and reincorporates paragraphs 1-105 as if fully set forth herein.

121.    Ellison is an individual with a disability under the PDCRA.

122.    At all relevant times, Ellison was qualified for the positions he held with Defendant.

123.    At all relevant times, Ellison could perform the essential functions for the positions he held with Defendant, either with or without a reasonable accommodation.

124.    During the time Ellison was employed by Defendant, he was subjected to disparate treatment and discrimination on the basis of his disability and/or perceived disability, as set forth herein.

125.    Defendant violated the PDCRA by, *inter alia*, the following acts:

a.    Constructively discharging Ellison because of his disability and/or perceived disability;

b.    Denying employment opportunities to Ellison because of his disability and/or perceived disability; and/or

c.    Subjecting Ellison to disparate treatment on the basis of his

disability and/or perceived disability.

126.    Defendant's discriminatory actions were willful, deliberate, and intentional.

127.    The injuries to Ellison that arose as a consequence of Defendant's conduct were foreseeable and intentionally caused by Defendant.

128.    As a direct and proximate result of the Defendant's violation of the PDCRA, Ellison suffered economic damages including but not limited to, loss of wages, loss of benefits, back pay, front pay, and other expenses.

129.    As a direct and proximate result of Defendant's violation of PDCRA, Ellison has suffered emotional, marital, and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

130.    As a direct, natural, proximate and foreseeable result of the actions of Defendant, Ellison has suffered injuries for which he is entitled to compensation, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

131.    Ellison, having been discriminated against by Defendant, has suffered irreparable harm for which there is no plain, adequate or complete remedy at law.

## COUNT III
## HOSTILE WORK ENVIRONMENT IN VIOLATION OF SECTION 504

132.    Ellison realleges and incorporates paragraphs 1-105 herein.

133.    Defendant's conduct, as detailed above, constitutes unlawful harassment based upon his disability and/or perceived disability, and his request for accommodation in violation Section 504.

134.    Defendant subjected Ellison to a hostile work environment on the basis of his disability and/or perceived disability, and his request for accommodation, which culminated in various tangible actions, the following acts:

    a.    Constructively discharging Ellison because of his disability and/or perceived disability;

    b.    Denying employment opportunities to Ellison because of his disability and/or perceived disability; and/or

    c.    Subjecting Ellison to disparate treatment on the basis of his disability and/or perceived disability.

135.    Defendant's harassing actions were willful, deliberate, and intentional.

136.    The injuries to Ellison that arose as a consequence of Defendant's conduct were foreseeable and intentionally caused by Defendant.

137.    As a direct and proximate result of the Defendant's violations of Section 504, Ellison suffered economic damages including but not limited to, loss

of wages, loss of benefits, back pay, front pay, and other expenses.

138.    As a direct and proximate result of Defendant's violations of Section 504, Ellison has suffered emotional, marital, and physical distress, mental and physical anguish, loss of reputation, humiliation, and embarrassment and the physical effects associated therewith, and will so suffer in the future.

139.    As a direct, natural, proximate and foreseeable result of the actions of Defendant, Ellison has suffered injuries for which he is entitled to compensation, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

140.    The conduct of Defendant was so willful and wanton, and performed with malice or reckless indifference to the statutory rights of Ellison, as to entitle him to an award of punitive damages against Defendant, to deter them, and others, from such conduct in the future.

141.    As a result of Defendant's violations of Section 504, Ellison has suffered irreparable harm for which there is no plain, adequate or complete remedy at law.

142.    Plaintiff is entitled to recover reasonable attorneys' fees and litigation expenses pursuant to Section 504.

## COUNT IV
## HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE PDCRA

143.    Ellison realleges and incorporates paragraphs 1-105 herein.

144.    Defendant's conduct, as detailed above, constitutes unlawful harassment based upon his disability and/or perceived disability, and his request for accommodation in violation the PDCRA.

145.    Defendant subjected Ellison to a hostile work environment on the basis of his disability and/or perceived disability, and his request for accommodation, which culminated in various tangible actions, including, but not limited to:

   a.    Constructively discharging Ellison because of his disability and/or perceived disability;

   b.    Denying employment opportunities to Ellison because of his disability and/or perceived disability; and/or

   c.    Subjecting Ellison to disparate treatment on the basis of his disability and/or perceived disability.

146.    Defendant's harassing actions were willful, deliberate, and intentional.

147.    The injuries to Ellison that arose as a consequence of Defendant's conduct were foreseeable and intentionally caused by Defendant.

148.    As a direct and proximate result of the Defendant's violations of the

PDCRA, Ellison suffered economic damages including but not limited to, loss of wages, loss of benefits, back pay, front pay, and other expenses.

149.     As a direct and proximate result of Defendant's violations of the PDCRA, Ellison has suffered emotional, marital, and physical distress, mental and physical anguish, loss of reputation, humiliation, and embarrassment and the physical effects associated therewith, and will so suffer in the future.

150.     As a direct, natural, proximate and foreseeable result of the actions of Defendant, Ellison has suffered injuries for which he is entitled to compensation, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

151.     As a result of Defendant's violations of the PDCRA, Ellison has suffered irreparable harm for which there is no plain, adequate or complete remedy at law.

152.     Plaintiff is entitled to recover reasonable attorneys' fees and litigation expenses pursuant to the PDCRA

## COUNT V
## RETALIATION IN VIOLATION OF SECTION 504

153.     Ellison realleges and adopts all pertinent parts of paragraphs 1-105 as if set forth herein.

154.     Ellison engaged in a protected activity when he requested a

reasonable accommodation for his disability, and each time he exercised the accommodation he was granted.

155. Beginning shortly after Ellison's initial request for a reasonable accommodation for his disabilities, and continuing after each time he engaged in protected activity, Defendant took adverse employment actions against Ellison, including, but not limited to:

> a. Constructively discharging Ellison;
>
> b. Denying employment opportunities to Ellison; and/or
>
> c. Subjecting Ellison to disparate treatment.

156. Defendant took these retaliatory actions because of Ellison's request for a reasonable accommodation for his disability, and because he exercised the accommodation he was granted.

157. Defendant's retaliatory actions were willful, deliberate, and intentional.

158. The injuries to Ellison that arose as a consequence of Defendant's conduct were foreseeable and intentionally caused by Defendant.

159. This retaliation would not have occurred but for Ellison engaging in protected activity under Section 504.

160. As a direct and proximate result of the Defendant's violation of Section 504, Ellison suffered economic damages including but not limited to, loss of wages, loss of benefits, back pay, front pay, and other expenses.

161.    As a direct and proximate result of Defendant's violation of Section 504, Ellison has suffered emotional, marital, and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

162.    As a direct, natural, proximate and foreseeable result of the actions of Defendant, Ellison has suffered injuries for which he is entitled to compensation, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

163.    The conduct of Defendant was so willful and wanton, and performed with malice or reckless indifference to the statutory rights of Ellison, as to entitle him to an award of punitive damages against Defendant, to deter them, and others, from such conduct in the future.

164.    Ellison is entitled to recover reasonable attorney's fees and litigation expenses pursuant to section 504.

165.    Ellison, having been retaliated against by Defendant, has suffered irreparable harm for which there is no plain, adequate or complete remedy at law.

## COUNT VI
## RETALIATION IN VIOLATION OF THE PDCRA

166.    Ellison realleges and adopts all pertinent parts of paragraphs 1-105 as if set forth herein.

167.     Ellison engaged in a protected activity when he requested a reasonable accommodation for his disabilities, and each time he exercised the accommodation he was granted.

168.     Beginning shortly after Ellison initial request for a reasonable accommodation for his disabilities, and continuing after each time he engaged in protected activity, Defendant took adverse employment actions against Ellison, including, but not limited to:

        a.     Constructively discharging Ellison;

        b.     Denying employment opportunities to Ellison; and/or

        c.     Subjecting Ellison to disparate treatment.

169.     Defendant took these retaliatory actions because of Ellison's request for a reasonable accommodation for his disability, and because he exercised the accommodation he was granted.

170.     Defendant's retaliatory actions were willful, deliberate, and intentional.

171.     The injuries to Ellison that arose as a consequence of Defendant's conduct were foreseeable and intentionally caused by Defendant.

172.     This retaliation would not have occurred but for Ellison engaging in protected activity under the PDCRA.

173.     As a direct and proximate result of the Defendant's violation of the PDCRA, Ellison suffered economic damages including but not limited to, loss of

wages, loss of benefits, back pay, front pay, and other expenses.

174.    As a direct and proximate result of Defendant's violation of PDCRA, Ellison has suffered emotional, marital, and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

175.    As a direct, natural, proximate and foreseeable result of the actions of Defendant, Ellison has suffered injuries for which he is entitled to compensation, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

176.    Ellison is entitled to recover reasonable attorney's fees and litigation expenses pursuant to the PDCRA.

177.    Ellison, having been retaliated against by Defendant, has suffered irreparable harm for which there is no plain, adequate or complete remedy at law.

## **REQUEST FOR RELIEF**

WHEREFORE, Ellison prays for damages in an amount to be determined at trial, together with interest, cost of suit, attorneys' fees, and all such other relief as the court deems just and proper which include:

a.     Declare that the aforementioned practices and actions of Defendant constitute unlawful employment practices in violation of Section 504 and the PDCRA;

b.     Award Ellison all lost wages, past and future, and other monetary damages to which he is entitled to including interest Section 504 and the PDCRA;

c.     Award Ellison compensatory damages under Section 504 and the PDCRA;

d.     Award Ellison punitive damages under the Section 504;

e.     Award Ellison exemplary damages under the PDCRA;

f.     Award Ellison reasonable attorney's fees, costs, and interest;

g.     Award Ellison equitable relief including, but not limited to: an injunction directing Defendant to cease their discriminatory conduct and practices; and

h.     Award such other relief as this Court deems just and proper and any other relief afforded under Section 504 and the PDCRA.

## <u>DEMAND FOR JURY TRIAL</u>

Ellison hereby demands a trial by jury.

Respectfully submitted

Dated:  September 3, 2020

By: */s/ Warren D. Astbury*
      Warren D. Astbury (P82416)
      Morgan & Morgan, P.A.
      Illinois Bar No.: 6298999
      Florida Bar No.: 78056
      California Bar No.: 311962
      2000 Town Center, Suite 1900
      Southfield, MI  48075
      (313) 739-1950
      wastbury@forthepeople.com

      *Attorney for Plaintiff*